Good morning. May it please the Court, Corin Bell on behalf of Lawrence Shaw. Subsections 1 and 2 of the Federal Bank Fraud Statute are materially different. While Subsection 2 broadly covers, by its plain language, schemes that aim to obtain money in the custody and the control of the bank, Subsection 1, more narrowly, includes schemes that aim to defraud the financial institution. Why don't you tell us a little bit about the facts, because they're very interesting. And I'm sure the people in the back of the room would like to know something about them. Yes, Your Honor. Mr. Shaw's scheme was to steal the money of a bank customer named Mr. Shu. And the way he did that was to set up an account in the name of the bank. But how did he find all this out, you know? Yes, Your Honor. He befriended this young lady, you know. He was living with his girlfriend, who happened to be the daughter of Mr. Shu's employee. Mr. Shu lived abroad, and he had his bank statement. He was a rich guy. He was a rich man, and he had his bank statement sent month after month after month to the home where Shaw resided. Where Shaw resided with the girlfriend of the employee. Correct. Right. Okay. Correct. And so Shaw was able to devise this plan to steal Mr. Shu's money as he realized that the statements were rolling in month after month unattended. He did this by setting up. It was about over a half million dollars. The scheme in total, he was able to steal about $300,000 of Mr. Shu's money. And Mr. Shu was left to hold, to sustain the lion's share of that actual loss. PayPal, which was the third-party non-bank entity, which Shaw used to essentially effect the transfers out of Bank of America, PayPal was left holding the remaining portion of the loss. And that is described at page 615 of the record. There was some disagreement between the parties. I think the record is uncontroverted that Bank of America never lost any money. Washington Mutual never lost any money. And neither bank in this particular setting bore the risk of loss because of Shu's recalcitrance in reviewing his own statements on the one hand and PayPal's role in allowing the outgoing transfers to occur. So it was almost a perfect crime. Yes. Except for when it ended up on my doorstep. Yes, Your Honor. And so this case requires this Court to construe subsection 1 of the bank fraud statement. It's a question of first impression in this circuit, although ten other circuits have opined on subsection 1. The question here is what an intent to defraud a financial institution means for purposes of subsection 1, whether it requires merely, as the government contends, proof of an intent to deceive the bank, or rather whether it requires proof of an intent both to deceive and cheat the bank, in other words, an intent to deprive the bank of some property interest, which is Shu's contention and is also the position of seven of the ten circuits that have opined on this particular issue. The government has never contended at any point in the proceedings and does not contend on appeal that it has shown proof of Shu's intent to cheat the bank. And therefore, this Court should reverse Shu's conviction and direct entry of judgment of acquittal if the Court does agree with Shu's construction of subsection 1. Well, let's talk about that, because the Ninth Circuit, as you are aware, we haven't adopted an exposure or risk of loss analysis. But even if we were to go there, I'm not saying we will, but even if we were to go there, why isn't there an exposure to risk of loss of B of A in this matter? The premise of your argument, as I understand it, and correct me if I'm wrong, is that he never intended to expose Bank of America to any risk of loss, right? That's the factual premise of your argument? Yes, Your Honor. It's a little broader, that he never intended to harm the banks in their property interest. All right, but how would he know that the bank isn't exposed to some risk of loss? Your Honor, because Bank of America, as I understand it, did pay out or no. Bank of America did pay out, but then they were reimbursed by PayPal. No, Your Honor. That was the, I think, the was somewhat muddied in the papers, but set forth in our reply brief. Actually, the record is uncontroverted on this point. The only witness that the defense called was the witness from Bank of America. The government did not cross-examine that witness. And at page 615 of the excerpts, the Court will see Bank of America never paid out a single reimbursement to Shu. In fact, Bank of America, when it got Shu's call, simply passed the buck to PayPal. PayPal immediately understood that it was the entity that had assumed the risk of loss for that 60-day period within which, before which, or outside of which, the risk of loss actually shifts to the customer. What was that E.R. reference? I've never heard that rule before. It was news to me. It was news to me as well. But, yes, the government actually, Your Honor, just to explain. 16? It was 615. Oh, 615. Is the particular point at which the Bank of America witnesses. But, counsel, what I don't. You're making a legal argument that as the law plays out, the actual, legally the risk was PayPal's and not the bank's. But that doesn't go to his intent to put the bank at some risk. And he was trying to get the bank to pay out money to the wrong person. And I don't see why that isn't the sufficient intent, regardless of the law of the circuit's split on the risk of loss. Your Honor, I appreciate the Court's focus on intent, because actually my response to Judge Nguyen was going to be that in terms of the actual loss or the risk of loss and these kind of complicated issues, that only matters to the extent it's circumstantial evidence of intent here. And I think there the Second Circuit's opinion in Ekanza is very useful, because what the Court there says, it was a similar type of scheme where the appellant aimed to get third-party money by deception of the bank. And there, there was actual testimony that the bank had lost money. And even so, the Court found that the evidence was, while not dispositive, simply was not clear enough to impute in a sufficiency of the evidence context intent, specific intent, the specific intent required to the appellant. And so the question is on this type of review, sufficiency of the evidence, what is permissible inference and what is speculation? Now, here, the design of the scheme of the scheme is to get the bank to pay to the wrong person. Well, the design of the scheme was to get Mr. Hsu's money. And actually, if you look at the facts, to the extent what is a permissible inference would be in this context, it would be that Hsu was not attending to his statements. That Mr. Hsu, in fact, aimed to drain the account before Mr. Hsu would ever even realize that the money was gone. And in fact, it did play out largely that way, because Hsu was left holding the lion's share of the loss. To the extent you can say, and I think this would be impermissible speculation, but to the extent you can say beyond that, if he were to have thought that there was an entity who would be responsible, which would that entity be, well, I think the permissible inferences, to the extent there is one, it would be PayPal, a non-bank. Because PayPal was the one that allowed Hsu to open the fraudulent account and to essentially transfer the money out. But in this setting, the government could have developed the evidence. There was an interview of Hsu. Well, listen, we've got it all. But do you got a citation to that rule that tells us that if the bank pays out your money to a third party on, say, on the basis of a forged check, that you have 60 days to find that out and notify the bank? Yes, Your Honor. I never heard of that. Yes, Your Honor. That was discussed at the government's witness, Washington Mutual witness, at page 428, and both the preceding pages and the subsequent pages. But there, and I did want to just reserve a tiny bit of time for rebuttal, but there, the government's own witness said, never testified that Washington Mutual, in this case, was placed at a risk of loss, and in fact said, in general, as if the bank, if the account is open fraudulently to begin with, we are not going to be at a risk of loss. So here, the evidence of the court's rebuttal. I heard your story. You've got three seconds. Want to save it? Yes, thank you, Your Honor. Go ahead. May it please the Court. Tracey Wilkinson on behalf of the United States. The issues in this case have become narrowed to a single question. Does intent to defraud necessarily mean an intent to cause a risk of pecuniary harm? I think that this circuit's case law instructs that it does not. And so the district court's jury instructions were correct as a matter of law. And the defendant was not entitled to his proposed alternate instructions. First, the proposed instructions with respect to intent to defraud were correct. This is the model language, 317, which has been upheld by this court in Treadwell and Shipsey. It is also the model jury instructions in the Third, Fifth, Sixth, Tenth, and Eleventh Circuit. Essentially, what is happening is that the defendant is trying, like the defendant in the recent Supreme Court case of Loughran, to add in an extra textual limit to the statute. And it's unnecessary, and it's not correct. There's a circuit split, as I understand it. But has any circuit ever interpreted the two sections differently with respect to risk of loss? Interpreted the two sections differently? One and two, we have to say that there is no such requirement in one section, but there is in the other. In the Eighth Circuit, there's a case called Staples in which it said that, interestingly, the first section didn't need risk of loss, and the second one did. We've got a little bit of everything. One thing I wanted to say on Loughran is I wanted to correct the record. The defendant really misstates the government's position. In our supplemental briefing on Loughran, the defendant says that the government has conceded in its arguments in its briefing before the Supreme Court in Loughran that risk of loss was something that was required. And that's an absolute misstatement. In fact, at pages 51 and 52, the government lawyer, in arguing before the Supreme Court, said specifically, we disagree with the Tenth Circuit precedent that says you need risk of loss under one, and went on to have a discussion with the court about what would happen. And this is where, if you read the entire context of the discussion, you see what's happening is the court is asking the government, well, what happens if we do what you want? Do we bring the defraud element from one into two, where there is also obtain? We have to prove both defraud and obtain, what results? And that is what's being discussed, not any concession. And even in the brief, we assume arguendo the Tenth Circuit position because that we were dealing with the Tenth Circuit position. But at no point has the government conceded that risk of loss is appropriate. Kagan, can you touch on sufficiency of the evidence, if you were to say, even assuming risk of loss analysis applies in this case? Isn't the scheme really to deceive Bank of America into transferring the money out of Mr. Hsu's account? With respect to the sufficiency of the evidence, yes. I mean, the scheme is to deceive the banks. The banks are where the money is. I mean, that's all that the defendant knows. And I think that Loffer makes this point a lot, which says that we don't want to – bank fraud isn't about this, you know, trying to know exactly what 60-day rule is and what this other rule is and who ultimately bears the loss. We don't want to get into bank law, and we don't – certainly don't want to get into what the defendant's understanding of bank law is. How do you address Ms. Bell's argument that, well, the intent here is really to defraud Mr. Hsu, because as it turns out, he did end up bearing the brunt of the loss in this case? Several things. One is, Mr. – the defendant here didn't know Mr. Hsu from Adam. He was getting these manna-from-heaven bank statements. But all he knew is there's money in the bank, and he wanted it. Well, he knew it belonged to somebody. He knew it belonged to someone, but he certainly didn't seek out to target this person. He didn't seek to steal this person's money over that person's money. He wanted money that was in the bank. And he created the PayPal as a shield. I mean, normally when you – in the old days, to get money out of a bank, you had to go up to the bank teller and pretend to be somebody. Well, he was using PayPal as a mask to pretend to be somebody to the bank. The bank was the goal here, and that's where that money was. And secondly, there's a real dispute between the government and the defendant about whether or not anyone actually had a risk or had an actual loss. And with respect to the 60-day rule, that 60-day rule is a moving time period. Every time the defendant lied to the bank and said, I'm Mr. Hsu, I'm the elder Mr. Shah, I have a right to this money, that 60-day period is moving right along with him. And in fact, when the victim, Mr. Hsu in this case, notified his bank, Bank of America, that very moment, that 60-day rule says, Bank of America, you are at a loss. You owe this amount of money to the defendant. And that's the point at which he noted, yes, they turned around and got the money from PayPal, and some from Washington Mutual, but the fact that they were able to get reimbursed doesn't take away the fact that they were at a loss at that moment. And it certainly shows an intended loss, or a risk of loss at that point. The one other thing that I wanted to correct is, with respect to the record, the defense makes the argument that the Washington Mutual witness was saying that Washington Mutual wasn't at a risk of loss if it was opened. That's not correct. If you look at the entire record at page 428, she was saying we wouldn't be, we wouldn't suffer a loss because we would be reimbursed. And I think that that's the sort of thing to be looking at all along, is yes, they may not suffer an ultimate loss because they will be reimbursed, but the case law with respect to bank fraud says over and over again, just because you're reimbursed doesn't mean there's a risk of loss. Has the banks done anything about, through their lobbyists, of making any change in this area? I don't know. I'm not sure. It certainly is. Well, they've got plenty of lobbyists, you know, and they got together with the credit card companies and eliminated the usury laws. And they're not going to do anything about it. And I think that's the sort of thing to be looking at all along, is yes, they may not  says over and over again, just because you're reimbursed doesn't mean there's a risk of     Has the banks done anything about, through their lobbyists, of making any change in this area? I don't know. I agree, Your Honor. I think we have a lot of complaints about banks, but one of the things that bank fraud and jury instructions repeatedly say is that the fault of the bank, if it, the fault of the bank doesn't make it not, make the defendant not guilty, right? We don't look to see if the bank could have been a better bank to see what the defendant's guilt is in the matter. And one of the things that I wanted to talk about was, it seems to be the defendant's main argument that Sections 1 and 2 are substantially different. It points to McNeil and says they are substantially different, and therefore, any case law with respect to 2 in this circuit cannot be true of Subsection 1. And that just simply isn't the case.       I think we have a lot of complaints about banks, but one of the things that bank fraud comes out and says, no, no, actually there's a substantial overlap between the sections. And that is, I think, fatal to the defendant's argument, because if there's a substantial overlap and if all of the arguments with respect to why risk of loss are not appropriate to Subsection 2, it applies to Subsection 1. Ginsburg. Couldn't the government have charged him under both here? Yes. Do you have any idea why it didn't?  about the additional misrepresentations that are required of Subsection 2. I think that that's not — I think we could have overcome that question, but I think that the issue in the charging prosecutor's mind was — Because it's more complicated? It was more complicated to prove these by means of additional misrepresentations. All right. Thank you. Thank you, Your Honor. Your time is really up, you know.                   You got six seconds. Thank you, Your Honor. I have to — I'm a very strict timekeeper. Appreciate that, Your Honor. Two quick points. Here, given the design — You already owe me 12 seconds. All right. Given the design of the scheme, Su's abdication of his responsibility review statement, Paypal's role as a non-bank third-party entity, it is sufficient to say that this — there was not the well-known exposure to loss that might support a finding beyond a reasonable doubt. Where's your client today? He's in jail. Good. Is — he's dreaming about going to Valley High or someplace like that? I think he's used his time well in prison, as I understand. And he was going to yoga last time I heard from him. So he is in prison. And our argument, in fact, is that this was a Subsection 2. Did you say he was going to Yale Law School? Yoga. Yoga. Yoga. He was going to yoga. Oh, yoga. He was going to yoga. But our argument is that this case could have been prosecuted under Subsection 2, per McNeill and Laughrin. This was a Subsection 2 case. Just remember I'm a stand-up comedian. You are very funny, Your Honor. Yeah, you are, too. Okay. I'm not trying to be. Thank you. You're a natural talent. Thank you, Your Honor. Okay. You're probably dangerous, too. All right. Thank you very much.
judges: Schroeder, Pregerson, Nguyen